[redacted]

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

LASHIFY, INC.,

Plaintiff,

v.

QINGDAO LASHBEAUTY COSMETIC CO., LTD. d/b/a WORLDBEAUTY,

Defendant.

Civil Action No. 6:22-cv-00776-ADA-DTG

JURY TRIAL DEMANDED

LASHIFY, INC.,

Plaintiff,

v.

QINGDAO HOLLYREN COSMETICS CO., LTD. d/b/a HOLLYREN,

Defendant.

Civil Action No. 6:22-cv-00777-ADA-DTG

JURY TRIAL DEMANDED

**[REDACTED VERSION]**

**PLAINTIFF LASHIFY, INC.'S OPPOSED MOTION TO EXCLUDE UNRELIABLE TEST DATA AND RELATED EXPERT TESTIMONY**

[redacted]

**TABLE OF CONTENTS**

**Page**


I. BACKGROUND ....1

A. Standard Pull-Testing Procedures and Equipment ....2

B. Special Considerations for Pull Tests on Artificial Eyelashes....3

C. Defendants' Hand-Pull Tests Lack Proper Controls....3

II. DEFENDANTS' PULL-TEST DATA IS UNRELIABLE ....4

A. Defendants' Test Apparatus and Methodology Has Not Been Tested, Has Not Been Subject to Peer Review and Publication, Has an Unknown Error Rate, and Has Not Been Accepted in the Scientific Community. ....5

B. Defendants' Tests Did Not Follow Standards or Implement Proper Controls....5

[redacted]

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Barnext Offshore v. Ferretti Grp. USA*,
No. 10-23869-CIV, 2012 U.S. Dist. LEXIS 198757 (S.D. Fla. May 24, 2012) ........................ 6

*Burleson v. Texas Dep't of Crim. Just.*,
393 F.3d 577 (5th Cir. 2004) ........................ 4

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................ 1, 4

*Pick v. Am. Medical Sys.*,
958 F. Supp. 1151 (E.D. La. 2024) ........................ 5, 6

*Warner Chilcott Lab'ys Ireland Ltd. v. Impax Lab'ys, Inc.*,
No. 2:08-CV-06304 WJM, 2012 WL 1551709 (D.N.J. Apr. 30, 2012) ........................ 5, 6

**RULES**

Fed. R. Evid. 702 ........................ 1, 4

**OTHER AUTHORITIES**

https://www.astm.org/d0638-14.html ........................ 2

[redacted]

## TABLE OF EXHIBITS[1]

| No. | Exhibit |
|---|---|
| A | Rebuttal Expert Report of Dr. Mays ("Mays Reb.") |
| B | Opening Expert Report of Dr. Gido ("Gido Op.") |
| C | Supplemental Expert Report of Dr. Gido ("Gido Sup.") |
| D | Excerpts of Dr. Mays' Deposition Transcript ("Mays Tr.") |

[1] Each of the exhibits listed herein is attached to the Declaration of Melanie L. Mayer submitted concurrently with this Motion.

[redacted]

Lashify moves under FRE 702 and *Daubert* to exclude unreliable test data and related expert testimony. Defendants' "pull-test" data purports to measure the bond strength between artificial hairs and their base before and after heating. But those tests did not follow industry standards governing pull testing procedures or implement proper test controls. Nor were they performed using standard pull test equipment. Rather, Defendants' expert *hand-pulled* 440 hairs using a bespoke, never-before-used apparatus, and in doing so failed to control for variables that both experts agree are critical to ensuring reliability—pull rate and pull force and direction. Defendants' expert also ignored another critical variable—the depth that the hair is embedded in the adhesive. All experts agree that embedment depth significantly effects the force required to pull a hair from the base. But even though Defendants reported great variability (10X) in embedment depth, they failed to control for it. Instead, hairs were plucked at random without measuring how deeply they were embedded. Defendants' failure to implement proper test controls makes their data and comparisons unreliable. If one sample has a lower pull force, you cannot know whether that is due to a weaker bond or instead due to a difference in pull rate, force, direction, or embedment depth. In *Daubert*, the Supreme Court charged trial judges with acting as gatekeepers and specifically highlighted the problems here—testing methods that have not "been subjected to peer review and publication" and that lack proper standards and controls. Defendants' decision to use a bespoke apparatus and their failure to use proper controls requires this Court to exercise its gatekeeping function to exclude those test results and related testimony.

## I. BACKGROUND

The Asserted Claims recite an artificial hair, or clusters of artificial hairs, attached to a base by "at least" an application of heat. (*See, e.g.,* claim 1 of the '260 patent.) Defendants' non-infringement defense is that [redacted] Defendants' expert, Dr. Mays, had

[redacted]

pull tests performed at his direction and concluded there was no difference between heated and unheated samples. (Mays. Reb. ¶¶ 166-173.) But, as explained below, that conclusion was based on unreliable test data from an experiment lacking proper controls for critical variables.

### A. Standard Pull-Testing Procedures and Equipment

Pull tests and the standards governing them are well known. (*E.g.*, Gido Op. ¶¶ 123-125; Gido Sup. ¶¶ 13-14, 16, 19, 24.) Specifically, "[a]nalyzing the bonding of an adhesive to a fiber using a Mechanical Pull-Out Test is a well-established testing technique," (Gido Op. ¶ 123), that is specified by industry-accepted standards, such as ASTM standards (Gido Sup. ¶¶ 13-14.)

Those standards ensure that pull test data is reliable and reproducible by mandating that key variables be controlled during an individual pull test and, if comparing samples, across all tests. One variable is the direction of force applied on the sample. Both experts agree that, when performing pull tests, the direction of the pulling force needs to be consistent. (Gido Sup. ¶ 17; Mays Tr. at 231:4-10.) Both experts also agree that the pull rate needs to be consistent. (Gido Sup. ¶ 19 ("comparing data from pull tests with different pull rates is not valid") (citing ASTM D638, Section 4.3)[2]); Mays Tr. at 233:10-25; *id.* at 233:16-19 ("You want to put a [] consistent force on the fibers as you pull them out…[and] control that as well as possible").)

Standard pull-test equipment ensures these variables are constant. Lashify's expert used an Instron tensile testing machine, (Gido Op. ¶ 245), which is calibrated to ASTM standards, (Gido Sup. ¶ 19.) That apparatus ensures that force is applied at a constant direction and at "a constant pull rate" across all the tests. (*Id.*) Other systems also exist. Dr. Mays has authored many papers on tensile testing, and every one of them used either an "Instron device or a Zwick device or some other commercial [tester]." (Mays Tr. at 188:11-23.)

---

[2] Available at https://www.astm.org/d0638-14.html.

[redacted]

### B. Special Considerations for Pull Tests on Artificial Eyelashes

Pull testing on false eyelash products must also control for embedment depth because individual hairs are not embedded into the adhesive at uniform depths. Both parties' experts agree that, the more contact area a hair has with the base adhesive, the more force it takes to remove the hair. (Gido Op. ¶ 124; *id.* ¶ 250 ("the pull-force depends on the length embedded"); Mays Reb. ¶¶ 152, 163 (variations in embedment depth "would be expected to create significant fluctuations in mechanical pullout strength"); Mays Tr. at 198:10-199:6.) [redacted] (Alpine Rep. ¶¶ 26-27.)

To accurately compare the forces required to extract two hairs from a base, the pull-out force must be normalized for the embedment depth. (Gido Op. ¶¶ 240-264; Gido Sup. ¶ 20).

### C. Defendants' Hand-Pull Tests Lack Proper Controls

Although Defendants' expert acknowledged that each of the variables identified above—pull rate, pull force and direction, and embedment depth—must each be controlled to properly measure force in and between pull tests, the testing performed on his behalf failed to control for each variable. (Gido Sup. ¶¶ 11, 14-21.) Rather than use standard equipment, Mr. MacDonald of Alpine Engineering & Design (the company contracted to perform the testing) constructed his own testing apparatus, (Alpine Rep. ¶ 9), including by purchasing tweezers which he used to hand pull each lash fiber from its base (*id.* ¶ 18.) Dr. Mays conceded that neither he nor Mr. MacDonald had previously used such a setup, and that he was unaware of *any* publication that disclosed a similar testing apparatus or that performed pull tests by hand. (Mays Tr. at 188:24-189:3, 259:13-261:5.) Instead, every publication he was aware of used standard equipment, such as an Instron or ZWICK apparatus. (Mays Tr. at 188:11-23.)

Mr. MacDonald's failure to use a standard commercial pull test apparatus meant he

[redacted]

could not control for pull rate and direction. (Gido Sup. ¶ 16 (Defendants' test data reflects Mr. MacDonald's inability to "control for the amount of force, the direction of the force, or the … rate of application of force")). Although Mr. MacDonald used a "vertical restraint bar" to attempt to control the direction of his hand, Dr. Mays conceded that Mr. MacDonald could not have ensured the direction of force applied by hand was perfectly vertical during a single test, (Mays Tr. at 232:6-13), much less across all 440 tests he performed, (*id*. at 236:12-23; Gido Sup. ¶ 18.) Dr. Mays also conceded that, by pulling with his hand, Mr. MacDonald's individual test results were likely influenced by a lack of constant pull rate. (Mays Tr. at 235:10-18; Gido Sup. ¶ 18 (explaining why the jagged peaks in Mr. MacDonald's data reflect inconsistent application of force).) And even though Mr. MacDonald had the ability to measure the embedment depth (he had previously done it a thousand times), he failed to control for that variable in his testing. Instead, he chose fibers "at random," (Mays Tr. at 202:11-203:7), [redacted] (Mays Reb. ¶ 163; Alpine Rep. ¶ 29.)

## II. DEFENDANTS' PULL-TEST DATA IS UNRELIABLE

*Daubert* and Rule 702 charge the trial judge to act as a gatekeeper and exclude unreliable scientific evidence and testimony. The five nonexclusive *Daubert* factors used to assess reliability are: (1) whether the expert's theory can be or has been tested, (2) whether the theory has been subject to peer review and publication, (3) the known or potential rate of error of a technique or theory when applied, (4) the existence and maintenance of standards and controls, and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Burleson v. Texas Dep't of Crim. Just.,* 393 F.3d 577, 584 (5th Cir. 2004); *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 593-594 (1993).

[redacted]

### A. Defendants' Test Apparatus and Methodology Has Not Been Tested, Has Not Been Subject to Peer Review and Publication, Has an Unknown Error Rate, and Has Not Been Accepted in the Scientific Community.

Dr. Mays admitted that neither he nor Mr. MacDonald had previously used any apparatus similar to what they used here, and that no publications disclosed a similar testing apparatus or pull tests performed by hand. (Mays Tr. at 188:24-189:3, 259:13-261:5.) Instead, all publications, including Dr. Mays' own, used standard equipment, such as an Instron or ZWICK apparatus. (*Id.* at 188:11-23.) Thus, the methodology used by Defendants cannot have "been tested," "subject to peer review and publication," or "accepted in the scientific community." The error rate of such testing is also unknown, and neither Dr. Mays nor Mr. MacDonald made any attempt to quantify it. Courts have precluded data from made-for-litigation tests like Defendants' for these reasons, and the Court should do so here. *See Warner Chilcott Lab'ys Ireland Ltd. v. Impax Lab'ys, Inc.*, No. 2:08-CV-06304 WJM, 2012 WL 1551709, at *21 (D.N.J. Apr. 30, 2012) (precluding reliance on bespoke "humidity treatment test" because it "has never been peer reviewed or published," the expert "could not point to a single peer-reviewed, academic paper in which" it was used, the expert "was not aware of any other scientist having used a humidity test" in that manner, and because the expert "made no effort to quantity the rate of error associated with his" test and "did not provide any data that would allow anyone else to quantify the rate of error inherent to his test."); *Pick v. Am. Medical Sys.*, 958 F. Supp. 1151, 1165 (E.D. La. 2024) (excluding reliance on a diagnostic test expert "developed himself," that was "not used by any other pathology lab," and not disclosed in "any published literature.").

### B. Defendants' Tests Did Not Follow Standards or Implement Proper Controls

Defendants' unique, unproven testing methodology and apparatus unsurprisingly led to a lack of proper controls. Defendants chose not to use standard testing equipment that meets technical standards. (Gido Op. ¶ 245; Gido Sup. ¶ 19; Mays Tr. at 188:11-23.). Instead, they

[redacted]

hand pulled fibers, meaning that Mr. MacDonald did not control for the direction or rate of force in a single test, much less across all 440 he performed. (Gido Sup. ¶¶ 16, 18; Mays Tr. at 232:6-13, 235:10-18, 236:12-23.) [redacted] (Gido Op. ¶¶ 124, 250; Gido Sup. ¶ 20; Mays Reb. ¶¶ 84, 152; Mays Tr. at 198:10-199:6; Alpine Rep. ¶¶ 26-27), [redacted] (Mays Reb. ¶ 163; Alpine Rep. ¶¶ 26-27, 29.) Instead, they plucked fibers at random. (Mays Tr. at 202:11-203:7.)

Dr. Mays suggested these uncontrolled factors would "just cancel[] out" because he assumed the variations in pull rate, pull force and direction, and embedment depth across the 440 tests of 22 samples would be similar. (Mays Tr. at 220:1-24.) But Dr. Mays did not collect any data to show that his (rather remarkable) assumption is correct. Nor did Dr. Mays observe any of the pull tests to determine how much the pull rate or pull force and direction varied across the 440 tests. (*Id*. at 263:12-15.) Similarly, Dr. Mays does not have any data on the embedment depth of the hairs subjected to pull tests. (*Id*. at 202:11-14.) The lack of proper test controls further warrants exclusion. *Warner*, 2012 WL 1551709, at *25 (excluding data where testing methodology was controlled by "nebulous standards" and expert "provided almost no explanation for the parameters he used"); *Pick*, 958 F. Supp. at 1165-66 (excluding test data where methodology was not endorsed by governing standards organization); *Barnext Offshore v. Ferretti Grp. USA*, No. 10-23869-CIV, 2012 U.S. Dist. LEXIS 198757, at *33 (S.D. Fla. May 24, 2012) (precluding burn test data where experiment lacked controls for "the temperature of the propane torch," "the duration of time the torch had been applied to the varying components, or the temperature of the components when the torch was applied to them").

[redacted]

Dated: June 13, 2024

FENWICK & WEST LLP

By: _/s/ Melanie L. Mayer_
Melanie L. Mayer

Saina S. Shamilov, CSB No. 215636
sshamilov@fenwick.com
J. David Hadden (CSB No. 176148)
dhadden@fenwick.com
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94014
650.988.8500
Fax: 650-938-5200

Bryan A. Kohm, CSB No. 233276
bkohm@fenwick.com
Shannon E. Turner, CSB No. 310121
sturner@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
415.875.2300
Fax: 415.281.1350

Melanie L. Mayer, WA Bar No. 36971
mmayer@fenwick.com
Jeffrey A. Ware, WA Bar No. 43779
jware@fenwick.com
Jonathan T. McMichael, WA Bar No. 49895
jmcmichael@fenwick.com
Daniel J. Emam, WA Bar No. 59129
demam@fenwick.com
FENWICK & WEST LLP
401 Union Street, 5th Floor
Seattle, WA 98101
206.389.4510
Fax: 206.389.4511

[redacted]

*Of Counsel*:

Deron R. Dacus (TX Bar #00790553)
ddacus@dacusfirm.com
THE DACUS FIRM, P.C.
821 ESE Loop 323, Suite 430
Tyler, TX 75701
903.705.1117
Fax: 903.581.2543

Attorneys for Plaintiff
Lashify, Inc.

[redacted]

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that (1) counsel has complied with the meet and confer requirement in Local Rule CV-7(G); and (2) the above-referenced motion is opposed. The parties conferred on June 12, 2024. No agreement could be reached.

By: *\/s/ Melanie L. Mayer*
Melanie L. Mayer

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who consented to electronic service are being served with a copy of this document and the attachments via electronic mail per Local Rule CV-5 on June 13, 2024.

By: */s/ Melanie L. Mayer*
Melanie L. Mayer